39 C.C.P.A.(Patents)
## CALDWELL v. BECK.
### Patent Appeals No. 5841.

United States Court of Customs and Patent Appeals.
March 18, 1952.

Rehearing Denied May 23, 1952.

Thomas M. Ferrill, Jr., New York City (Paul B. Hunter, Great Neck, Long Island, N. Y., of counsel), for appellant.

Henry R. Ashton, M. R. McKenney and H. A. Burgess, New York City (Harry R. Pugh, Jr., and George C. Lord, New York City, of counsel), for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges.

JACKSON, Judge.

This is an appeal in an interference proceeding from a decision of the Board of Interference Examiners awarding priority of invention of the subject matter embraced within a single count to appellee.

There are involved a patent application of appellant for "Object Detecting and Locating System," serial No. 443,573, filed May 19, 1942, and a patent of appellee, No. 2,409,183, dated October 15, 1946, on an application, serial No. 455,322, filed August 19, 1942, for "Microwave Antenna." Appellee, being the junior party, has the burden of proving priority of invention by a preponderance of the evidence.

The count originated in the Beck patent and was copied by appellant for the purpose of bringing about this interference. The count reads as follows: "1. An antenna system comprising a pair of wave guides each having a separate aperture for emitting and collecting radiant energy, a concave reflector facing the separate apertures and having a focus positioned between said apertures."

Apparently there is no dispute concerning the count being fully supported in the application of appellant and the patent of appellee since no interlocutory motions were filed.

Oral testimony was produced by both parties together with exhibits which appear in evidence.

Appellant, in his preliminary statement, alleged as follows: drawings of the invention first made and a written description thereof together with a disclosure to others, on or about April 2, 1941; reduction of the invention to practice by construction and successive tests thereof, in the fall of 1941; and the exercise of reasonable diligence beginning on or about April 2, 1941.

It appears in the preliminary statement of appellee that the first drawing, written description, and disclosure to others was made on or before February 6, 1941; reduction to practice on or about May 17, 1941; and the exercise of reasonable diligence beginning on or before February 6, 1941.

The invention relates to a directive antenna system, particularly to a system which is utilized in radio range and direction finding systems. The antenna is composed of two parts, one being a concave reflector, and the other, two wave guides with apertures therein located adjacent to each other and facing the reflector, the focus of the reflector being positioned between the apertures. The apertures are alternately energized in transmission and reception. The two beams, or lobes, issuing from the guides overlap each other and, in radar operation, sharp directivity is obtained because in the region of the lobe cross-over or equi-intensity point, the directive action is critical. There is a lobe switch or similar device ordinarily used to connect the wave guides alternately to the radar transceiver.

It appears that in the latter part of 1940 the Bell Laboratories were requested by the United States Army to develop an accurate direction finding antenna for use on airplanes in locating and bombing enemy targets at sea with weather conditions of poor visibility. The device was characterized by the letters BTO which means "Bombing Through Overcast." The task of performing such work was assigned by the Bell Laboratories to what is known as "The Antenna Group" at Holmdel, New Jersey. The work was in charge of the immediate superior of appellee who was given the problem of developing the sought antenna.

It appears from the testimony of appellee that prior to February 6, 1941 he suggested the use of two wave guides situated at the focus of a parabolic reflector with the apertures of the guides at right angles to the reflector, and thereby producing a two-lobed directional pattern with the desired polarization. Such arrangement was shown in one of the exhibits for appellee which was not relied upon for conception. The arrangement of the structure, as shown in the exhibit, required a rapidly operating guide switch which was not then available.

On May 17, 1941, appellee tested a dual wave guide antenna system wherein one of the guides had a co-axial-to-wave guide transducer and the other was closed with a movable piston which in action would simulate the function of a switch. The antenna in the apparatus of that test disclosed a double lobe directive pattern and the test was said to have been satisfactory.

The board rejected the contention of appellee that conception of the invention defined by the count was May 17, 1941, because the count does not contemplate the kind of structure which was used in the May 17, 1941 test, but, on the contrary, defined a system "having two wave guides which are adapted to be connected to a transducer alternately."

It further appears that on May 21, 1941, appellee received a suitable wave guide, or lobe, switch and incorporated it in a modified dual wave guide system which comprised two contiguous wave guides with separate apertures facing the reflector and mounted with the focal axis of the reflector thereof between them. The system was tested on May 22, 1941, at an airplane radio range (radar) at Holmdel. The board held that that system, as tested, supported the count and that the test established conception as of May 22, 1941.

After several other tests of the apparatus, appellee brought it to Whippany early in June, 1941, and saw it used with the BTO equipment. The entire BTO device was ground tested in radar operation on August 25–26, 1941, for efficiency of the entire device, including its component parts. The tests were satisfactory from a ground loca-

tion. Subsequently, the BTO device was flight tested in airplanes at Wright Field, Ohio. The test consisted in locating ship targets on Lake Erie September 19–23, 1941. Freighters, in excess of 20 miles in distance, were located and the pilot of the plane was so directed by the device that he flew directly over the freighters. It was further tested at Mitchell Field, Long Island, between October 7–16, 1941 and was then turned over to the army.

After the antenna of appellee had been tested at Holmdel, as above noted, a request came from the Navy for the development of an SJ Submarine Radar which would include an accurate directive finding antenna. Such radar antenna was developed and is shown in several figures of appellee's patent, and is known as the "SJ Radar Antenna." In its essentials, it is substantially identical with the BTO antenna.

A "preproduction" model of the SJ antenna was installed at Atlantic Highlands, New Jersey, on a cliff overlooking the ocean and was successfully tested for range and bearing indications between October 8–10, 1941. The same model was installed on the destroyer U.S.S. Semmes and successfully tested near New London, Connecticut during the months of November and December of that year. A production model of the SJ antenna was also installed on the submarine U.S.S. Haddock near Portsmouth, New Hampshire, and successfully and repeatedly employed for range and bearing indications in April, 1942.

The board held that appellee had successfully reduced his antenna device to practice at least as early as October 16, 1941.

In the decision of the board it is stated that counsel for appellant did not appear to question the readability of the count on the physical elements of the device of appellee but that he did question whether "the important limitation" of the count was met as to location of the focal point *between the apertures.*

It is conceded in the brief on appeal by counsel for appellant that if the record of appellee establishes the 1941 radar tests to be an actual reduction to practice of the apparatus meeting the express require-

ments of the count, then the decision of the board should be affirmed.

Counsel for appellant contend that the apparatus of appellee, which was used in the radar test, although it contained the paraboloidal focusing reflector and wave guides with apertures facing toward it, had not been proved in the record so as to meet the last limitation of the count reading "* * * having a focus positioned between said apertures."

The board, with respect to the position of appellant on the question of the meaning of that limitation in the count, stated that counsel for appellant had quoted the dictionary definition of the word "between" as "in the space which separates." It then observed that the word "between" had several different dictionary definitions. The board then pointed out the well known rule that a limitation appearing in a count will be given the broadest interpretation that it will reasonably support.

The board noted that the count originated in the patent of appellee and stated that a reading of the application did not disclose that the word "between" had been given any special or specific meaning or that it was limited to the meaning "in the space which separates" the apertures. It then pointed out: "* * * Another meaning of 'between' is 'in common to', i.e., the focal point is not positioned on the left side nor on the right side of the apertures but in the common wall between them. This is a broader definition than the one quoted by Caldwell and in our opinion is a reasonable one. It seems to us that if Beck intended to limit his claim to the extent contended by Caldwell he would have used an expression limiting the focal point not only to 'between' the apertures but also 'in the plane thereof.' Since he did not so limit his claim it is not apparent now that he intended so to do. Limitations, not appearing in the count, should not be read into it."

It is the contention of counsel for appellee that his antennas which were reduced to practice had reflective focus between the wave guide apertures as required by the count.

It appears that appellee, in describing the original dual feed antenna, testified that the apertures face the concave side of the spun aluminum reflector and are situated on each side of its focus, and in describing the antenna which was successfully tested in the flight tests at Wright Field and shown in a photograph exhibit, appellee stated: " * * * the two wave guides, which I called 'drives', which were mounted facing and each side of the focus of the 29 inch long focus paraboloid * * *" The same testimony was given by appellee in describing the SJ antenna.

One of the corroborating witnesses for appellee testified that: " * * * The common wall between the wave guides was maintained in a position always to include the parabolic focus, while the distance of the pair of guides from the parabolic surface was varied and the position of the piston was also varied to seek the maximum output from the guide * * *." Another of appellee's witnesses testified: "The dual wave guide feed has two rectangular apertures which are symmetrically disposed on opposite sides of the focus of the parabola. The distance of the feed from the parabola is such that the apparent center of radiation from each feed is at approximately the focal distance from the parabola." A third witness for appellee testified: " * * * the antenna was fed from two adjacent sources in front of the reflector, one slightly to the right and one slightly to the left of the focal point. The microwave signals were fed to the reflector alternately from the two sources, while lobe switching."

Counsel for appellee contend that the limitation of the count does not require that the apertures be at the exact focal distance from the reflector. They observe that a nose is commonly referred to as being between the eyes and, quoting from Funk & Wagnalls New Standard Dictionary of the English Language, 1938, they noted that the nose is defined as being "between the forehead and the upper lip." They then contend that the interpretation of the word "between" as used by counsel for appellant is too limited and that such meaning, restricting the focus to be positioned as lying on the same plane as the apertures, would exclude two common uses of the word which they said was " * * because clearly the nose is not in the same plane as the eyes, nor is it in the same plane as the forehead and the upper lip. However, the nose is between the eyes and between the forehead and the upper lip in the commonly accepted meaning of the term 'between' just as the focus of the Beck antennas was 'between' the apertures."

■ It seems to us that the position taken by the board in giving to the contested limitation of the count its broadest meaning was proper and we find no sound reason to disagree with it. In our opinion, it is established in the record of appellee that the May 22, 1941 radar test was an actual reduction to practice of the structure defined in the count. Therefore, it is unnecessary, in the light of the concession made by counsel for appellant hereinbefore referred to, to discuss the record made on behalf of appellant.

For the reasons hereinbefore set out, the decision of the board is affirmed.

Affirmed.